UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA    :
                            :
                            :
v.                          :    CRIMINAL NO: 05-10167-JLT
                            :
RONALD HAZEL                :

### DEFENDANTS' SENTENCING MEMORANDUM

Ronald (Ronny) Hazel appeared before Your Honor on August 17, 2005, and pleaded guilty to a 2-count Information: Count One, Attempt to EvadeTax in violation of Title 26 U.S.C. §7201 and Count Two, Sale of Drug Paraphernalia in violation of Title 21 U.S.C. §863. For the most part, the Plea Agreement is consistent with the presentence report except that the Agreement contemplates an offense level 14 while the presentence report has arrived at level 15.

### Guideline Calculations

The Probation Office has determined that the Total Offense Level for the defendant is 15, Criminal History Category III for a guideline range of 24 to 30 months. The defendant's only objection to Probation's calculations involves the number of criminal history points. The defendant submits that he has four points instead of five. While the difference of one point does not change the Criminal History Category of III, it does place the defendant at the low end of Criminal History Category III. *See* Objection ¶45.

In accordance with the Plea Agreement, the defendant has submitted that there are three grounds for downward departure under the guidelines: §§ 5H1.1 and 5H1.3 Age

1

and Infirmity; §5H1.12 Outstanding Military Service; *Olbres* departure for hundreds of Third Word people put out of work if Hazel is unavailable to maintain his business, not to mention to 8 – 20 employees who work for Hazel in Provincetown. The grounds will be further explicated below

It is now settled law pursuant to *United States v Booker,* 125 S.Ct. 738 (2005), that when imposing sentence the Court must consider the Sentencing Guidelines and Policy Statements. In that regard, the Sentencing Commission has provided guidance in determining when there may be factors that mitigate the guideline range.

*Booker* requires that in addition to considering the final advisory guideline calculation, the sentencing court is mandated to consider the statutory sentencing factors at 18 U.S.C. §3553(a) among which are (a)(1), the nature and circumstances of the offense and the history and characteristics of the defendant. As the circumstances of the offense and the defendant's personal history are intricately intertwined, we shall deal with them together.

### Nature and Circumstances of the Offense and
### Ronny Hazels's Personal History and Characteristics

The instant offense began at least by 1999 as an investigation into Ronny's business as a suspected place for drug distribution. Ronny had been under suspicion for many years by the local police, but the investigation never produced any evidence that Ronny was a drug distributor. Toward the end of this extensive drug investigation, the defendant's store sold a bottle of Isobutyl Nitrate over-the-counter to an undercover police officer. The defendant advised that Isobutyl Nitrate was at one time a legal drug which later became illegal. Also found were some drug paraphernalia. Ronny has since

learned which items are offensive and illegal and which are acceptable. Inasmuch as the sale of Isobutyl Nitrate was part of the instant investigation, it should not count as part of the Criminal History. (Objection PSR ¶45) Further investigation revealed the IRS violations.

Ronald Hazel affirmatively admits that he evaded taxes by failing to report all the cash receipts to the IRS. He admits this situation came about because his business is based on buying and selling in cash. It began with his extensive use of the services of UPS that demanded cash on delivery COD (Cash on Delivery). As cash came in, cash also went out. Accounting for all receipts was sloppy or non-existent. Hazel is in the process, through his tax attorney, of sorting out his IRS obligations. He would like to take a loan out on the business property to pay off his debt. It is, however, difficult to get such a loan until his tax returns are filed and the bank can review his finances. He has every intention of paying what he owes and of cooperating with the IRS.

### Background

Ronny Hazel was raised in Brooklyn, New York, in a working class family, and although he describes his family as "close and affectionate," he left home at 15 to travel and pursue his education in his own way. At age 20, he was drafted into the US Army and, after advanced infantry training, he was sent to Vietnam where he saw considerable combat. He was wounded twice and in addition to the Purple Heart he was awarded the Air Medal (twice), the Army Commendation Medal, and the Bronze Star—this last for his heroic conduct in caring for his fellow soldiers after a horrific explosion in a minefield. After some 8 months in military hospitals, Hazel was honorably discharged in 1971.

Still only 22 years old, Hazel spent the next decade traveling throughout Asia, Mexico, and the United States. He reports that he married a Yolanda Cruz in 1972 and they had two sons; although the marriage did not last, he states that he effectively raised his sons as a single parent since they were ages seven and three. Meanwhile, by 1981 Hazel had settled down on in Provincetown, Massachusetts, where he opened the first of his retail stores in a building he bought at that time.

Over the ensuing years, Hazel opened two more stores in Provincetown; all three of his stores have sold pretty much the same types of goods: hemp clothing, tie-dyed T-shirts, sterling silver jewelry, crystals, incense, sunglasses, pop culture merchandise, and adult novelties and toys. Eventually he placed his stores under two wholly own corporations, Time Passages, Inc. and Visionary Concepts of New York, Inc. Many of the items sold in his stores come from Asian countries such as India and Nepal, and Hazel makes frequent visits to his suppliers and manufacturers in those countries. In the course of these frequent visits, he has come to develop relationships that go far beyond routine business dealings.

The several letters (attached) from these foreign business associates attest to this—they are clearly more than the formal letters of recommendation solicited in such situations. Typical is the sentiment expressed by Jevan Kumar, a manufacturer and exporter of jewelry in India, who writes:

> I have without exception always found him to be a loyal and decent individual. Through our working relationship I have watched over the years as Ronny, through sacrifice, hard work, and a dedication has become a successful businessman and yet has continuously, unselfishly and generously given back to family, friends and community including all his suppliers and business associates like myself in foreign countries.
> Ronny is now and always has been a loyal and honest businessman; he is an upstanding individual possessing strong character, great inner strength and

4

gentle warmth. Through these many years, I have always considered it an honor to call Ronny my friend rather than a buyer.

Hazel's operations in Provincetown generally employ some 8 individuals year round and then, when the summer tourist season heats up, he usually takes on another dozen employees. In addition to the stock on display in his three retail outlets, Hazel maintains a large inventory—an extraordinarily large inventory, according to the probation officer who visited his operations. It is apparent that Ronny purchases so much material because he feels a certain obligation to his suppliers and the individuals who make these items –in effect, he has found himself running his own "developing nations" aid program.

This is no exaggeration, for in fact, Hazel's business has provided employment for many "third world" people who might not otherwise be able to achieve a livelihood. Letters from his suppliers in India and Nepal attest explicitly to this. Mina Maharjan, managing director of a firm in Nepal who states she has known Hazel for 11 years as a purchaser of her firm's textiles, writes:

> He is the main buyer of my company, which is helping 300 women to earn money for their food, that is really good for our poor country in Nepal…I really appreciate he is buying the goods from our company to help so many women to feed themselves so without him many of them will be Jobless.

A letter from the Fashion Shoppe in New Delhi states:

> He [Hazel] has generated a lot of business for our company. Merchandise ordered by him is usually produced in the handicrafts sector based in rural India. Hundreds of people get direct employment due to business given by him.

Raju Shrestha writes from Kathmandou, Nepal of his 14-year business relationship:

> We have found Mr. Hazel a kind, generous, thoroughly reliable and honest business man. He had contributed a major trade development in my company

5

which results that my company stands today as the biggest Handicraft and Metal Exporters from Nepal. With his contribution in trade relations from Nepal many rural people get employment in handicraft sector.

Kamal Poddar writes from India:

Ronny Hazel and I…have been working together for the past decade or so and I can say with assurance that he is one of my favorite buyers. I currently live in India …involved in export business of ladies garments, and own 3 factories which employ over 400 people…
A major part of my total employees today have a livelihood only because of Ronnie and our business with Shop Therapy Imports.

A superficial glance at Hazel's financial assets would suggest that he has somehow accumulated a significant fortune----over $3 million. In fact, all except about $250,000 of that is due to the inflation-increased value of the real estate he bought in Provincetown many years ago. And it is not at all clear just what he could expect to realize if he had to liquidate his entire stock; most likely it would not have a great monetary value as most of the items are relatively cheap wholesale and derive their value mainly from the markup for the retailing operations. No single item may cost or sell at any significant sum, and it has only been his own presence, experience, and energy that have kept his business going.

In addition, much of the value of Hazel's business derives from his frequent attendance at trade shows across the country, where sales and purchases are consummated. As with his contacts abroad, Hazel's business is extremely dependent on his personal relationships with others at these trade shows. It is at these trade shows that Hazel is able to move much of the merchandise that would remain in his warehouse, otherwise unsold. A schedule of trade shows that Ronny has recently attended and

would like to attend in the next few months is appended to this memorandum. Attendance at these shows enables Ronny to maintain the equilibrium of the business.

There can be no justification for the crime that Hazel is charged with, and in fact it may seem hard to understand how the individual described by his business associates and friends ended up doing this. But it might help to explain that in a business like his, carried on primarily with day-to-day cash sales, it can become all too easy to lose track of exact income and expenses over a year, with a staff to pay, purchases to be made, trade shows to attend, ongoing bills of all kinds to pay. Business and personal accounts become mixed and eventually it becomes both hard to do the accounting for tax payments and too easy to believe that in any case the business is not all that profitable. There is no sign that Hazel has engaged in an extravagant lifestyle or that he owns any significant possessions aside from two low-end vehicles necessary for his business. As mentioned earlier, the value of his two properties is due entirely to the fact that he was able to purchase them before the major rise in Provincetown real estate values.

As mentioned, although Hazel's youthful marriage ended in divorce, he has been and is the responsible parent to the two sons of that marriage. A childhood friend, Donna Bosalavage writes: "Ronny is a dedicated family man as well. Raising two sons on his own, he proved himself to be a loving and involved father and more recently, a doting grandfather to his three grandchildren. He was a caring and attentive son to his widowed mother and helped support her until her death two years ago." The defendant also credits his own parents and close friends with aiding him during the years when the boys were children. Both sons—one now 31, the other 27—are employed by their father and live with him in his Provincetown home. They remain close to and supportive of their father.

Hazel has also been involved with Erica Cole for over 20 years, and in April 2005 she came to Provincetown to manage one of his retail stores while he dealt with this medical concerns and the instant offense. Letters from other individuals also attest to the kind of loyalty he has inspired in those who have known and worked with him over the years.

Aside from the impact on his ability to repay the money he owes, incarcerating Hazel as this time would most likely have a major effect on his health. For some time now he has been suffering from Stage IV squamous cell carcinoma, a tumor that has invaded his mouth, throat, and neck and has resulted in operations, the latest of which has required that all his teeth be removed. A Stage IV tumor is defined by the National Institute as the largest size and of the invasive type. Letters from the two specialists who have been treating Hazel attest to the seriousness of this condition. Dr. Daniel Deschler writes that Hazel "requires close and attentive follow up by physicians specifically trained in the management of advanced squamous cell carcinoma." Dr. John Buehler writes; "I need to see him in my office to insure that his cancer has not returned as well as to treat the infections, bone loss, and continue the reconstruction associated with his cancer and treatment. I fear that his health and in fact his life would be jeopardized if he does not have access to his treating physicians, including myself and many others who all played a part in Ronny's treatment and recovery."

It might also be added here that, although Hazel himself has never pressed this issue or indeed made anything of it, it is possible that his cancer has resulted from his frequent and close exposure to Agent Orange during his service in Vietnam.[1] That aside,

---

[1] The Institute Of Medicine: Division of Health Promotion and Disease Prevention reports on a community based case-control study examining herbicide exposure and skin cancers which controlled for a number of factors known to influence skin cancer rates, found increasing risk of squamous cell carcinoma with increasing lifetime exposure to herbicides. Although inconclusive, the committee encourages further study

8

his military service, although not excusing the instant offense, would seem to call for some special consideration. The defendant's attorney asked Ronny to provide the details of events that earned him his medals. This recounting is taken from the defendant's objections to the presentence report at ¶¶93-95 and retold here for the Court's convenience.

The defendant advised that he was drafted in 1969 into the U.S.Army. He was assigned to an Infantry Unit Ranger Battalion in the 1st Infantry Division operating in the area surrounding Saigon in the Black Virgin Mountain Area. Shortly after volunteering for a 3-day Sniper School, Ronny was placed with the 2nd Battalion 16th Infantry Ranger Unit. They were sent to the front and worked from fire support bases and night defensive positions. They were deployed from fire support base 3 days at a time into the jungle with a shower only once a week. After his first 30 days, Ronny volunteered to be the company tunnel rat. His small stature enabled him to crawl into any bunker or tunnel the enemy had dug.

He carried the M79 Grenade Launcher. Grenadiers or Thump Gunners, were never called upon to walk flank or point for the platoon because they were forced to carry huge amounts of high explosives, which the Viet Cong knew. One good shot at the Thump Gunner and they could wipe out the whole platoon. In September Ronny received a minor wound (his first) from a booby trap that injured the Lieutenant and four others. That was his first experience with the seriousness of the situation. The Lieutenant suffered a sunken chest wound, Ronnie states "that really freaked me out –

---

of basal and squamous cell skin cancer incidence among working and Vietnam veteran populations. (See Attached Chapter 7 <u>Cancer</u>)

9

watching air sucking out of the chest cavity." In his own words, further events that led to the Bronze medal are as follows:

> On or about Christmastime 1969 we were assigned the Jungle and sealing off Saigon to make it safe for Bob Hope and the troops. What a sucky Christmas that was. The day after Christmas on the 26th our unit was assigned an operation in an area we had never been to, the Parrots Beak on the border of Vietnam and Cambodia. At the time, the Viet Cong in the South, were being supplied by China through Cambodia. President Nixon began to order infantry units to cross over into Cambodia to stem the flow of supplies. In anticipation the Viet Cong heavily mined this area. We were dropped in and kept in. After one week our supplies were out and we were ordered to remain. We were re-supplied by air but the drop was off by one click. Our Lieutenant cut our platoon of 22 men in half sending eleven to retrieve the supplies that were dropped before they were reached by the Viet Cong. Myself and 10 others, led by the Lieutenant were chosen for the retrieval. We found ourselves in the middle of a minefield. The 155mm shell was detonated by the point man and immediately killed 6 and amputated 3, leaving only myself and the Vietnamese Kit Carson Scout standing. My wounds consisted of intestinal Shrapnel and Shrapnel to the neck arms and lower body. The point man had lost his left foot, our platoon Sergeant behind him both his legs, of which I could find neither legs nor feet. Directly behind the Platoon Sergeant our Lieutenant was cut in half with the upper torso and head detached from the body. His Kilo or Radio man was sliced in half and I used his belt to tie in his intestines. When Medivac arrived they placed this poor slob in a poncho instead of a stretcher and sealed his fate, he died on the floor of the helicopter with me holding his hand. After the initial mine explosion the only way to mark our position, luckily for the wounded, was an outdated flare round I had been carrying around for my grenade launcher thus the Army Accommodation Medal. The Bronze Star was awarded for my refusal to board the Medivac before all the wounded and dead were taken out. For the following fifteen minutes, until units were deployed and helicopters sent in, I was left in a position to deal with the dead and wounded. The longest 15 minutes of my life. What do you tell someone with no legs below his knees while he screams for his mother? Very difficult for me. I was 21 years old.
>
> I was immediately taken to a field hospital in the rear and surgery was within 3 hours. After 2 weeks in this field hospital situation, my wounds were deemed serious enough to be Medivaced to an army hospital in Yokahama, Japan where I spent the next 4 months before returning to the United States to a Navy Hospital for another 4 months, (St. Albans, Queens, NY).

Jose Manuel Fajardo, one of Hazel's fellow soldiers in Vietnam, has written of two combat incidents in which Hazel demonstrated extraordinary courage. Of the more serious, Fajardo has written:

> Specialist 4th Class Hazel, with no prior experience in medicine or communications, and under extreme stress, attended to the wounded and dying, and guided the rescue medi-vac operation through a successful extraction of all our wounded and dead. He himself refused medical attention and evacuation until all the more seriously wounded were treated.

It was this conduct that earned Hazel the Bronze Star, and although he was so seriously wounded that he had to be discharged from the army, he has not spent his life trading on his wounds or his time in Vietnam but has worked at the business described above, the business that continues to provide work for so many other individuals both in the United States and abroad..

## Meeting the Purposes of this Sentence

As Ronny Hazel stands now before the Court, the Court must impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in the statute at 18 U.S.C.§3553(a)(2) i.e., (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense. (B) to afford adequate deterrence to criminal conduct. (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner.

Clearly, Hazel's offense is a serious one that deserves a sentence that provides some form of punishment. The defendant submits that a sentence of Probation with some period of Home Detention that will enable Ronny to continue operating his business, begin paying the IRS, would suffice as a just punishment in this case. Such a

11

sentence will also permit Ronny to continue treatment for his very deadly form of cancer. On December 21, 2005, Dr. Buchler provided an update advising of Ronny's current condition and of his need for careful and continued medical care.

> As a follow-up to my letter dated 10/25/05, I would like to outline the continued treatment that Ronny Hazel has needed in the last 8 weeks. As a result of Ronny's aggressive cancer and subsequent treatment consisting of radical neck dissection and radiation, Ronny has developed multiple infections and bone loss and his jaw is diseased. Since my last letter, Ronny has undergone two extractions with extensive bone grafting in preparation for reconstruction of his jaw. He will require implant placement four months from the time of the bone grafts, so I can estimate he will require further surgery in mid to late February. Ronny has had tremendous bone loss as a result of the cancer and his reconstruction will be a slow and pain-staking process. In addition to the reconstruction, I continue to monitor Ronny for any signs of the return of his aggressive cancer. His ongoing treatment and need for regular exams by me as well as other physicians will continue for the rest of his [life] due to the aggressive nature of his cancer and the extensive side effects from his treatment.

As for deterrence, there can be no question that Ronny has learned a valuable lesson from this prosecution. The investigation has been ongoing for nearly seven years. Hazel has been held under the scrutiny of the DEA and IRS for such an extended period that not only has he been deterred from any sort of illegal activity, but those who live and work with him have lived through this experience as well.

The court must also consider the need to avoid unwarranted disparity with similarly situated defendants who have committed similar offenses. In that regard, the court is asked to consider that Ronny Hazel's personal characteristics are of such an extreme that it would be rare to find another defendant so similarly situated, save for the offense. With regard to his criminal history and others with a similar Criminal History Category, it is noted that Hazel's criminal offenses are, for the most part, related to the business. He has had little tolerance for shoplifters and run-ins with shoplifters have resulted in court appearances. Hazel has since learned that while he is angered and

irritated by shoplifters, he cannot and will not touch them. There have been no further incidents since September 1997 described by Probation at ¶44 of the presentence report.

Whether or not the Court relies on departure grounds for his age and medical condition, his outstanding military service, and the collateral consequence of putting hundreds of Third World people out of work, a sentence of Probation with conditions is sufficient, but not greater than necessary to provide some punishment but to also balance the ends of justice.

Respectfully submitted, the defendant,<br>
Ronald Hazel, by his attorney,<br>
<br>
/s/ JOHN M. MOSCARDELLI<br>
JOHN M. MOSCARDELLI, BBO #357340<br>
Peters & Moscardelli<br>
Eight Winter Street, 12th Floor<br>
Boston, MA 02108<br>
Tel. (617) 423-6222<br>
Attorney for the Defendant, Ronald Hazel

DATED: December 27, 2005

**Committee to Review the Health Effects in Vietnam Veterans of Exposure to Herbicides**

**INSTITUTE OF MEDICINE: Division of Health Promotion and Disease Prevention**

NATIONAL ACADEMY PRESS
Washington, D.C. 1999

NOTICE: The project that is the subject of this report was approved by the Governing Board of the National Research Council, whose members are drawn from the councils of the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine. The members of the committee responsible for the report were chosen for their special competences and with regard for appropriate balance.

The Institute of Medicine was chartered in 1970 by the National Academy of Sciences to enlist distinguished members of the appropriate professions in the examination of policy matters pertaining to the health of the public. In this, the Institute acts under the Academy's 1863 congressional charter responsibility to be an adviser to the federal government and its own initiative in identifying issues of medical care, research, and education. Dr. Kenneth I. Shine is president of the Institute of Medicine.

Support for this study was provided by the Department of Veterans Affairs (contract no. VJ01(93)P-1331).

Copyright 1999 by the National Academy of Sciences. All rights reserved.

**COMMITTEE TO REVIEW THE HEALTH EFFECTS IN VIETNAM VETERANS OF EXPOSURE TO HERBICIDES (SECOND BIENNIAL UPDATE)**

David Tollerud, MD, MPH (Chair),1,2 Professor, School of Public Health, MCP Hahnemann University
Michael Aminoff, MD,2 Professor, Department of Neurology, University of California at San Francisco School of Medicine
Steven Goodman, MD, MHS, PhD, Associate Professor, Department of Oncology, Division of Biostatistics, Johns Hopkins University School of Medicine
Robert Herrick, PhD, CIH, Lecturer on Industrial Hygiene, Department of Environmental Health, Harvard School of Public Health
Irva Hertz-Picciotto, PhD, Associate Professor, Department of Epidemiology, University of North Carolina, Chapel Hill
David Hoel, PhD, Distinguished University Professor, Medical University of South Carolina
Andrew Olshan, PhD,1,2 Associate Professor, Department of Epidemiology, University of North Carolina, Chapel Hill
Trevor Orchard, MBBCh, MMSc, Professor, University of Pittsburgh, Rangos Research Center
Howard Ozer, MD, PhD, Professor, Department of Medicine, MCP Hahnemann

University
Kenneth Ramos, PhD,2 Professor, Department of Physiology and
Pharmacology, Texas A&M University College of Veterinary Medicine
Noel Rose, MD, PhD,2 Professor, Department of Molecular Microbiology and
Immunology, Johns Hopkins University School of Hygiene and Public Health
Susan Woskie, PhD, CIH, Associate Professor, Department of Work
Environment, University of Massachusetts, Lowell
Susan Woskie, PhD, CIH, Associate Professor, Department of Work
Environment, University of Massachusetts, Lowell

1 Member of the committee responsible for Veterans and Agent Orange (1994).
2 Member of the committee responsible for Veterans and Agent Orange: Update 1996.

**Preface**

In response to the concerns voiced by Vietnam veterans and their families, Congress called upon the National Academy of Sciences (NAS) to review the scientific evidence on the possible health effects of exposure to Agent Orange and other herbicides (Public Law 102-4, enacted on February 6, 1991). The creation of the first NAS Institute of Medicine (IOM) committee, in 1992, underscored the critical importance of approaching these questions from a non-partisan scientific standpoint. The original Committee to Review the Health Effects in Vietnam Veterans of Exposure to Herbicides realized from the beginning that it could not conduct a credible scientific review without a full understanding of the experiences and perspectives of veterans. Thus, to supplement its standard scientific process, the committee opened several of its meetings to the public in order to allow veterans and other interested individuals to voice their concerns and opinions, to provide personal information about individual exposure to herbicides and associated health effects, and to educate committee members on recent research results and studies still under way. This information provided a meaningful backdrop for the numerous scientific articles that the committee considered.

Veterans and Agent Orange: Health Effects of Herbicides Used in Vietnam (abbreviated as VAO in this report) reviewed and evaluated the available scientific evidence regarding the association between exposure to dioxin or other chemical compounds contained in herbicides used in Vietnam and a wide range of health effects. The report provided information for the Secretary of Veterans Affairs to consider as the Department of Veterans Affairs carried out its responsibilities to Vietnam veterans. It also described areas in which the available scientific data were insufficient to determine whether an association exists and provided the committee's recommendations for future research.

Public Law 102-4 also tasked the NAS to conduct biennial updates that would review newly published scientific literature regarding statistical associations between health outcomes and exposure to dioxin and other chemical compounds in these herbicides. The first of these, Veterans and Agent Orange: Update 1996 (Update 1996) was published in March of that year. The focus of this second updated review is on scientific studies published since the release of Update 1996. To conduct the review, the

IOM established a committee of 12 members representing a wide range of expertise to take a fresh look at the studies reviewed in VAO and Update 1996 along with the newest scientific evidence. In order to provide a link to the experience and expertise developed by the previous committees, five of the members of the committee responsible for this report were recruited from the committee responsible for Update 1996; two of these individuals also served on the VAO committee. All committee members were selected because they are leading experts in their fields, have no conflicts of interest with regard to the matter under study, and have taken no public positions concerning the potential health effects of herbicides in Vietnam veterans or related aspects of herbicide or dioxin exposure. Biographical sketches of committee members and staff appear in Appendix C.

The committee worked on several fronts in conducting this updated review, always with the goal of seeking the most accurate information and advice from the widest possible range of knowledgeable sources. Consistent with procedures of the NAS, the committee met in a series of closed sessions and working group meetings in which members could freely examine, characterize, and weigh the strengths and limitations of the evidence. It also convened two open meetings to provide the opportunity for veterans and veterans service organizations, researchers, policymakers, and other interested parties to present their concerns, review their research, and exchange information directly with committee members. The first of these was held in conjunction with the committee's second meeting in June 1997 in Washington, D.C.; the second in Irvine, California, in October, 1997. To solicit broad participation, the committee sent announcements to individuals, organizations, and listserves known to have an interest in this issue. The oral presentations and written statements submitted to the committee are described in detail in Appendix A. In order to address one area of interest identified by the Department of Veterans Affairs, the committee convened a workshop on the combination and reanalysis of existing data on the health effects of herbicide and dioxin exposure. The workshop, which took place in August 1997, brought together experts in these methodologies with researchers who have developed and analyzed datasets evaluating the health of Vietnam veterans and individuals exposed t herbicides or dioxin. The results of this effort will be addressed in a separate report....

The committee also benefited from the assistance of several scientists and researchers who generously lent their time and expertise to help give committee members insight on particular issues, provide copies of newly released research, or answer queries concerning their work. Special thanks are extended to Drs. Bruce Armstrong (New South Wales Cancer Council, Australia), Michael DeVito (U.S. EPA), Keith Horsley (Commonwealth Department of Veterans' Affairs, Australia), Han Kang (U.S. Department of Veterans Affairs), Stephen Katz (National Institutes of Health, DHHS), Edward McCarthy (Johns Hopkins University), Joel Michalek (Armstrong Laboratory, USAF), and Jerry Rice (International Agency for Research on Cancer).

**Chapter 7 CANCER**
**Basal and Squamous Cell (Nonmelanoma) Skin Cancer317**

A recent community based case-control study examining herbicide exposure and skin cancers drew the attention of the committee (Gallagher et al., 1996). This study, which controlled for a number of factors known to influence skin cancer rates, found

increasing risk of squamous cell carcinoma with increasing lifetime exposure to herbicides. Although there are concerns regarding the study's control of confounding and the adequacy of the exposure assessment, the committee concluded that the study was the best of its kind to date. The available evidence is insufficient to determine whether an association exists between herbicide exposure and any of the forms of skin cancer. However, the committee encourages further study of basal and squamous cell skin cancer incidence among working and Vietnam veteran populations. In any future studies, careful attention should be paid to exposure assessment, as well as to controlling for confounding from UV exposures. Efforts to examine the carcinogenicity of organic arsenicals are also encouraged.

UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| v. | ) | Criminal No. 05-10167-JLT |
| | ) | |
| RONALD HAZEL, | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

I, JOHN M. MOSCARDELLI, counsel of record for the Defendant, Ronald Hazel, hereby certify that I have this day served a copy of the Defendant's Sentencing Memorandum upon counsel of record for the United States of America and Federal Probation Services by mailing the same, postage pre-paid, to:

| | |
|---|---|
| **John P. McAdams, Esquire** | **Tricia Marcy, U.S. Probation Officer** |
| Assistant United States Attorney | Federal Probation Services |
| United States Attorney's Office | United States District Court |
| 601 D Street, NW, Room 7548 | John J. Moakley U.S. Courthouse |
| Washington, DC  20004 | One Courthouse Way, Suite 1200 |
| | Boston, MA 02110 |

JOHN M. MOSCARDELLI
BBO No. 357340
Peters & Moscardelli
Eight Winter Street, 12th Floor
Boston, MA  02108
Tel. (617) 423-6222
Attorney for Defendant Ronald Hazel

DATED: December 27, 2005